Timothy MB Farrell, Esq.
**LAW OFFICES OF GORMAN & GAVRAS**
A Professional Corporation
2nd Floor, J & R Building
**208 Route 4**
Hagåtña, Guam 96910
Telephone: 472-2302
Facsimile: 472-2342

**Attorneys for Plaintiff**
**JUAN Q. PEREZ**



FILED
DISTRICT COURT OF GUAM
SEP 1 7 2004
MARY L. M. MORAN
CLERK OF COURT

# IN THE U.S. DISTRICT COURT

# OF GUAM

| | |
|---|---|
| **JUAN Q. PEREZ,** | **CIVIL CASE NO. 02-00025** |
| **Plaintiff,** | |
| **vs.** | **MOTION FOR LEAVE TO SERVE ADDITIONAL DISCOVERY** |
| **DONGWON INDUSTRIES CO., GUAM; THE VESSEL "UNIVERSAL KIM"; and DONGBU INSURANCE CO., LTD.** | |
| **Defendants.** | |

Comes now Plaintiff, by and through counsel and moves for leave to serve additional discovery. Specifically, Plaintiff would like to serve additional requests for admissions.

Plaintiff served his first request on April 17, 2003. Defendant duly responded. This discovery request consisted of only twelve questions.

On July 25, 2003, after the depositions of several important witnesses, including the Plaintiff, Plaintiff served a second request for admissions. This request consisted of twenty questions, for a total of thirty two requests. See attached. On August 19, 2003,

Defendant objected on the grounds that a court order prevented a party from serving more than one set of requests for admissions absent a court order.

In January of this year, the law offices of Gorman and Gavras hired Timothy MB Farrell as an associate. Mr. Farrell has an LL.M. in admiralty and has tried maritime cases. Mr. Farrell was a commercial fisherman before going to law school. He practiced maritime law and tried several cases in Seattle, before moving to Guam. As such, Mr. Farrell is familiar with the docks and how to prepare a personal injury case. After reviewing the file, another request for admissions was drafted, but not served on defendants, pending the outcome of settlement negotiations.

The parties met to discuss the need for responses to Plaintiff's requests. On August 26, 2004, plaintiff's counsel sent a stipulation to defense counsel. See attached letter. This stipulation consisted of most of the plaintiff's requests for admissions, which counsel believed the parties had agreed were not issues in the case. See attached stipulation. Defense counsel did not respond within the time agreed, necessitating this motion.

The Local Rules of Practice for the District Court of Guam (GR or General Rules) governs practice before this Court. The local Civil Rules (LR) apply to all civil actions. LR 33.1(a) limits each party to one set of requests for admission, which shall not exceed twenty-five in number. Any party desiring to serve additional discovery shall set forth the reasons establishing good cause for their use.

2

This is a matter of first impression before this Court. There are no published decisions locally on discovery disputes under the local rules or the standard the Court should apply to determine whether or not good cause exists to grant leave to serve additional requests for admissions.

Plaintiff submits that good cause exists for service of additional admissions because they will help speed the presentation of the case at trial. Many of the questions were not originally asked because depositions had not been conducted when the first request was served. Since that time the issues have been narrowed and plaintiff has hired additional counsel, who has his own ideas on how to try the case.

The focus of the questions thirteen to thirty two is the issue of negligence. Plaintiff hopes to get an admission that the vessel would not have lurched forward but for the negligence of the vessel. By doing so, plaintiff will not have to present expert testimony on the issue and defendants will not have to put on their witness. In addition, the parties will not have to depose each other's expert and pay for transcripts. Finally, plaintiff has been seeking copies of the log books from defendants, which defendants claim they do not know whether or not they exist. Plaintiff's expert needs to review these log books to determine why the vessel lurched forward. Plaintiff's expert, as a matter of due diligence also needs to see the log books, especially the engine room log books to see if there are any admissions of fact or references to witnesses that have not been interviewed. If the log books do not exist in violation of Coast Guard regulations, then a presumption can be made that they contain evidence favorable to the plaintiff.

3

By simply stipulating to the fact that the vessel should not have moved forward, a motion to compel can be avoided and the trial can be greatly shortened.

The focus of the remaining questions are on facts necessary to help the finder of fact understand the case. For example, plaintiff would like to show the jury a picture of the vessel and a map of the area so it can get a feel for the location and how the accident occurred. Plaintiff can probably testify as to the facts necessary to have the documents at issue admitted, however, an admission pre trial will simplify the process so that the trial can focus on the substance of the case.

For the forgoing reasons, Plaintiff respectfully requests leave to serve additional requests for admissions.

LAW OFFICES OF GORMAN & GAVRAS

Date: September 16, 2004.                    By: _____
                                             TIMOTHY MB FARRELL, ESQ.
                                             Attorneys for Plaintiff
                                             JOAQUIN Q. PEREZ

4

A. Alexander Gorman, Esq.
**LAW OFFICES OF GORMAN & GAVRAS**
**A Professional Corporation**
**2nd Floor, J & R Building**
**208 Route 4**
**Hagåtña, Guam 96910**
**Telephone:  472-2302**
**Facsimile:     472-2342**

Attorneys for Plaintiff
**JUAN Q. PEREZ**





## IN THE U.S. DISTRICT COURT

## OF GUAM

JUAN Q. PEREZ,

          Plaintiff,

      vs.

**DONGWON INDUSTRIES CO., GUAM;**
**THE VESSEL "UNIVERSAL KIM"; and**
**DONGBU INSURANCE CO., LTD.**

          Defendants.

_____/

**CIVIL CASE NO. 02-00025**

**PLAINTIFF'S FIRST REQUEST**
**FOR ADMISSIONS TO**
**DEFENDANT DONGBU**
**INSURANCE CO., LTD.**

TO:   **DONGBU INSURANCE COMPANY, LTD.**

Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, Plaintiff hereby requests that you admit or deny within thirty (30) days from the date of service, and in accordance with the instructions set out below, the following Requests for Admissions to be served upon Plaintiffs' attorneys, the Law Offices of Gorman & Gavras, whose address is 2nd Floor, J&R Building, 208 Route 4, Hagåtña, Guam 96910:

### INSTRUCTIONS

These Requests for Admissions are to be deemed continuing and if Defendant or any of its agents, or attorneys discover additional information as to matters inquired of in these Requests for Admissions, between the time the answers are made and the date

**Perez v. Dongwon Industries Co., Guam., et al**
**Plaintiff's First Requests for Admissions to**
**Defendant Dongbu Insurance Co., Ltd.**

of trial, supplemental answers shall be made informing Plaintiffs and their attorneys as to the newly discovered information.

## REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION 1.

Please admit or deny that DONGBU INSURANCE CO., LTD. had issued an insurance policy covering liability for negligence that was in full force and effect on August 12, 2000 insuring Defendant Dongwon Industries Co., Guam.

### REQUEST FOR ADMISSION 2.

Please admit or deny that DONGBU INSURANCE CO., LTD. had issued an insurance policy covering liability for negligence that was in full force and effect on August 12, 2000 insuring Defendant the vessel "Universal Kim".

### REQUEST FOR ADMISSION 3.

Please admit or deny that DONGBU INSURANCE CO., LTD is in the business of insurance on Guam.

### REQUEST FOR ADMISSION 4.

Please admit or deny that DONGBU INSURANCE CO., LTD is contractually obligated to provide liability coverage for Defendant Dongwon Industries Co., Guam, for the accident which is the basis of the within lawsuit.

### REQUEST FOR ADMISSION 5.

Please admit or deny that DONGBU INSURANCE CO., LTD is contractually obligated to provide liability coverage for Defendant the vessel "Universal Kim" for the accident which is the basis of the within lawsuit.

2

Perez v. Dongwon Industries Co., Guam., et al
**Plaintiff's First Requests for Admissions to
Defendant Dongbu Insurance Co., Ltd.**

**REQUEST FOR ADMISSION 6.** Please admit or deny that DONGBU INSURANCE

CO., LTD is contractually obligated to pay any judgment or award of damages for

negligence entered against Defendant Dongwon Industries Co., Guam in the within

lawsuit, up to the maximum limit of $1,000,000.00.

**REQUEST FOR ADMISSION 7.** Please admit or deny that DONGBU INSURANCE

CO., LTD is contractually obligated to pay any judgment or award of damages for

negligence entered against Defendant the vessel "Universal Kim" in the within lawsuit,

up to the maximum limit of $1,000,000.00.

Dated: April 16, 2002                    LAW OFFICES OF GORMAN & GAVRAS

By_____

A. ALEXANDER GORMAN, ESQ.
Attorneys for Plaintiff
JUAN Q. PEREZ

3

William L. Gavras, Esq.
**LAW OFFICES OF GORMAN & GAVRAS**
A Professional Corporation
2nd Floor, J & R Building
208 Route 4
Hagåtña, Guam 96910
Telephone:  472-2302
Facsimile:  472-2342

**Attorneys for Plaintiff**
**JUAN Q. PEREZ**

IN THE U.S. DISTRICT COURT

OF GUAM

| | |
|---|---|
| JUAN Q. PEREZ, | CIVIL CASE NO. 02-00025 |
| Plaintiff, | |
| vs. | PLAINTIFF'S SECOND REQUEST FOR ADMISSIONS TO DEFENDANT DONGWON INDUSTRIES CO., LTD. |
| DONGWON INDUSTRIES CO., LTD.; THE VESSEL "UNIVERSAL KIM"; and DONGBU INSURANCE CO., LTD. | |
| Defendants. | |

RECEIVED

JUL 25 2003

MAY 3PM
KLEMM BLAIR STERLING & JOHNSON

TO:    **DONGWON INDUSTRIES CO., LTD.**

Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, Plaintiff hereby requests that you admit or deny within thirty (30) days from the date of service, and in accordance with the instructions set out below, the following Requests for Admissions to be served upon Plaintiff's attorneys, the Law Offices of Gorman & Gavras, whose address is 2nd Floor, J&R Building, 208 Route 4, Hagåtña, Guam 96910:

**INSTRUCTIONS**

These Requests for Admissions are to be deemed continuing and if Defendant or any of its agents, or attorneys discover additional information as to matters inquired of in these Requests for Admissions between the time the answers are made and the date

**Perez v. Dongwon Industries Co., Guam., et al**
**Plaintiff's Second Request for Admissions to**
**Defendant Dongwon Industries Co., Ltd.**

of trial, supplemental answers shall be made informing Plaintiff and his attorneys as to

the newly discovered information.

## REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION 13.

Please admit or deny that a third party contractor was working inside the vessel

Universal Kim at the time of the bunkering/fueling, operation wherein Plaintiff was

injured.

### REQUEST FOR ADMISSION 14.

Please admit or deny that the motor vessel Universal Kim at the time of the

subject accident was subject to the rules and regulations of the U.S. States Code of

Federal Regulations and United States Coast Guard as to the conduct and procedures

for bunkering/fueling operations within the Territory of Guam.

### REQUEST FOR ADMISSION 15.

Please admit or deny that the vessel Universal Kim is subject to the rules and

regulations of ISM and ISO as to procedures for the bunkering/fueling of its vessel

Universal Kim.

### REQUEST FOR ADMISSION 16.

Please admit or deny that there was an electrical engineer working in the engine

room of the vessel Universal Kim at the time of the accident to Plaintiff Juan Perez.

2

**Perez v. Dongwon Industries Co., Guam., et al**
**Plaintiff's Second Request for Admissions to**
**Defendant Dongwon Industries Co., Ltd.**

## REQUEST FOR ADMISSION 17.

Please admit or deny that the said electrical engineer was a member of the crew of the Universal Kim.

## REQUEST FOR ADMISSION 18.

Please admit or deny that the said electrical engineer was an employee of Dongwon Industries Co., Ltd..

## REQUEST FOR ADMISSION 19.

Please admit or deny that just prior to the accident causing injuries to Juan Perez the propeller of the vessel Universal Kim was engaged causing the vessel Universal Kim to move forward out of control during the bunkering operation because the said electrical engineer or employee moved the clutch lever to see which light(s) were impacted.

## REQUEST FOR ADMISSION 20.

Please admit or deny that the vessel Universal Kim's movement forward at the time of the accident to Plaintiff Juan Perez, was out of control.

## REQUEST FOR ADMISSION 21.

Please admit or deny that the cause of the vessel Universal Kim's moving forward, at the time Mr. Juan Perez was injured, was that the clutch lever in the ship's engine room was moved causing the engaging of the propeller.

3

Perez v. Dongwon Industries Co., Guam., et al
Plaintiff's Second Request for Admissions to
Defendant Dongwon Industries Co., Ltd.

## REQUEST FOR ADMISSION 22.

Please admit or deny that Universal Kim has a safety check list for

bunkering/fueling operations such as were occurring at the time Juan Perez was injured.

## REQUEST FOR ADMISSION 23.

Please admit or deny that Universal Kim was subject to the rules and regulations

and guidelines and procedures of the United States Coast Guard on Guam relevant to

bunkering, fueling, operations within the Territory of Guam.

## REQUEST FOR ADMISSION 24.

Please admit or deny that Defendant Dongwon Industries, Co. is responsible to see

that undue movement of the vessel Universal Kim does not occur during the bunkering,

refueling procedures of said vessel.

## REQUEST FOR ADMISSION 25.

Please admit or deny that the bunkering hose was connected to the shore and to

the vessel Universal Kim at the time of the injury to Plaintiff Juan Perez.

## REQUEST FOR ADMISSION 26.

Please admit or deny that the vessel Universal Kim did move under its own power

while the bunkering hose was connected to it.

4

**Perez v. Dongwon Industries Co., Guam., et al**
**Plaintiff's Second Request for Admissions to**
**Defendant Dongwon Industries Co., Ltd.**

## REQUEST FOR ADMISSION 27.

Please admit or deny that just prior to the acceding causing injuries to Juan Perez the vessel Universal Kim moved under its own power breaking some of the lines that were connecting it to the shore.

## REQUEST FOR ADMISSION 28.

Please admit or deny that in its movement under its own power at the time that it was being bunkered the vessel Universal Kim stretched the bunkering hose in such a way that the manifold was ripped from its foundation.

## REQUEST FOR ADMISSION 29.

Please admit or deny that the start pumping order for fuel to be processed through the bunkering hose into the vessel Universal Kim had already been given just prior to the accident causing injuries to Juan Perez.

## REQUEST FOR ADMISSION 30.

Please admit or deny that it is a deviation from the standard of care in the maritime industry to permit a vessel's engines to be on while the vessel is bunkering.

## REQUEST FOR ADMISSION 31.

Please admit or deny that it is a deviation from the standard of care in the maritime industry to permit a vessel's engines to be turned on while the vessel is tethered to the dock during a refueling operation.

5

**Perez v. Dongwon Industries Co., Guam., et al**
**Plaintiff's Second Request for Admissions to**
**Defendant Dongwon Industries Co., Ltd.**

## REQUEST FOR ADMISSION 32.

Please admit or deny that it is a deviation from the standard of care in the maritime

industry to permit a vessel to lurch or move forward while the refueling hose is connected

to the ship in a bunkering operation.

Dated: July 25, 2003                        LAW OFFICES OF GORMAN & GAVRAS

By_____
WILLIAM L. GAVRAS, ESQ.
Attorneys for Plaintiff
JUAN Q. PEREZ

A. Alexander Gorman, Esq.
**LAW OFFICES OF GORMAN & GAVRAS**
A Professional Corporation
2nd Floor, J & R Building
208 Route 4
Hagåtña, Guam 96910
Telephone: 472-2302
Facsimile: 472-2342

**Attorneys for Plaintiff**
**JUAN Q. PEREZ**

## IN THE U.S. DISTRICT COURT

## OF GUAM

JUAN Q. PEREZ,                                    CIVIL CASE NO. 02-00025

        **Plaintiff,**

                              **PLAINTIFF'S THIRD REQUEST**
        vs.                         **FOR ADMISSIONS TO**
                                **DEFENDANTS**

DONGWON INDUSTRIES CO., GUAM;
THE VESSEL "UNIVERSAL KIM"; and
DONGBU INSURANCE CO., LTD.

               **Defendants.**
_____/

TO:   **DONGWON INDUSTRIES CO. AND DONGBU INSURANCE CO. LTD.**

     Pursuant to Rule 36(a) of the Federal Rules of Civil Procedure, Plaintiff hereby

requests that you admit or deny within thirty (30) days from the date of service, and in

accordance with the instructions set out below, the following Requests for Admissions to

be served upon Plaintiffs' attorneys, the Law Offices of Gorman & Gavras, whose

address is 2nd Floor, J&R Building, 208 Route 4, Hagåtña, Guam 96910:

### INSTRUCTIONS

     These Requests for Admissions are to be deemed continuing and if Defendant or

any of its agents, or attorneys discover additional information as to matters inquired of in

these Requests for Admissions, between the time the answers are made and the date

**Perez v. Dongwon Industries Co., Guam., et al**
**Plaintiff's Third Requests for Admissions to Defendants**
**January, 2004**

of trial, supplemental answers shall be made informing Plaintiffs and their attorneys as

to the newly discovered information.

## REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION 33.

Please admit or deny that the attached overhead photograph is a true and

accurate representation of the Port of Guam.

### REQUEST FOR ADMISSION 34.

Please admit or deny That the attached diagram is a true and accurate

representation of the Port of Guam and the location of the fuel facilities.

### REQUEST FOR ADMISSION 35.

Please admit or deny that the attached photograph is a true and accurate

representation of the vessel.

### REQUEST FOR ADMISSION 36.

Please admit or deny that the attached pages are true and accurate copies of the

Port of Guam's Harbor Rules and regulations pages 1, 5, 6, 7, 20, and 21.

LAW OFFICES OF GORMAN & GAVRAS

Date:  January 12, 2004          By: _____
                                 A. ALEXANDER GORMAN, ESQ.
                                 Attorneys for Plaintiff
                                 JUAN Q. PEREZ

2

Timothy MB Farrell, Esq.
**LAW OFFICES OF GORMAN & GAVRAS**
**A Professional Corporation**
**2nd Floor, J & R Building**
**208 Route 4**
**Hagåtña, Guam 96910**
**Telephone:   472-2302**
**Facsimile:    472-2342**

**Attorneys for Plaintiff**
**JUAN Q. PEREZ**

## IN THE U.S. DISTRICT COURT

## OF GUAM

| | |
|---|---|
| JUAN Q. PEREZ, | **CIVIL CASE NO. 02-00025** |
| Plaintiff, | |
| vs. | **STIPULATION** |
| DONGWON INDUSTRIES CO., GUAM;<br>THE VESSEL "UNIVERSAL KIM"; and<br>DONGBU INSURANCE CO., LTD. | |
| Defendants.<br>_____/ | |

COMES NOW the parties, by and through counsel and stipulate to the following

facts:

1.      A third party contractor was working inside the vessel *Universal Kim* at the

time of the bunkering/fueling, operation wherein Plaintiff was injured.

2.      The motor vessel *Universal Kim* at the time of the subject accident was

subject to the rules and regulations of the U.S. States Code of Federal Regulations and

United States Coast Guard as to the conduct and procedures for bunkering/fueling

operations within the Territory of Guam.

3.      The vessel *Universal Kim* is subject to the rules and regulations of ISM

4. There was an electrical engineer working in the engine room of the vessel *Universal Kim* at the time of the accident to Plaintiff Juan Perez.

5. The said electrical engineer was a member of the crew of the *Universal Kim*.

6. The said electrical engineer was an employee of Dongwon Industries Co., Ltd..

7. Just prior to the accident causing injuries to Juan Perez the propeller of the vessel *Universal Kim* was engaged causing the vessel *Universal Kim* to move forward out of control during the bunkering operation because the said electrical engineer or employee moved the clutch lever to see which light(s) were impacted.

8. The vessel *Universal Kim's* movement forward at the time of the accident to Plaintiff Juan Perez, was out of control.

9. The cause of the vessel *Universal Kim's* moving forward, at the time Mr. Juan Perez was injured, was that the clutch lever in the ship's engine room was moved causing the propeller to engage.

10. The *Universal Kim* has a safety check list for bunkering/fueling operations such as were occurring at the time Juan Perez was injured.

11. The *Universal Kim* was subject to the rules and regulations and guidelines and procedures of the United States Coast Guard on Guam relevant to bunkering, fueling, operations within the Territory of Guam.

12. The Defendant Dongwon Industries, Co. is responsible to see that undue movement of the vessel *Universal Kim* does not occur during the bunkering, refueling procedures of said vessel.

2

13.     The bunkering hose was connected to the shore and to the vessel *Universal Kim* at the time of the injury to Plaintiff Juan Perez.

14.     The vessel *Universal Kim* did move under its own power while the bunkering hose was connected to it.

15.     Just prior to the accident causing injuries to Juan Perez the vessel *Universal Kim* moved under its own power breaking some of the lines that were connecting it to the shore.

16.     That in its movement under its own power at the time that it was being bunkered, the vessel *Universal Kim* stretched the bunkering hose in such a way that the manifold was ripped from its foundation.

17.     The start pumping order for fuel to be processed through the bunkering hose into the vessel *Universal Kim* had already been given just prior to the accident causing injuries to Juan Perez.

18.     It is a deviation from the standard of care in the maritime industry to permit a vessel's engines to be on while the vessel is bunkering.

19.     It is a deviation from the standard of care in the maritime industry to permit a vessel's engines to be turned on while the vessel is tethered to the dock during a refueling operation.

20.     It is a deviation from the standard of care in the maritime industry to permit a vessel to lurch or move forward while the refueling hose is connected to the ship in a bunkering operation.

21.     The attached overhead photograph is a true and accurate representation of the Port of Guam.

3

22.    The attached diagram is a true and accurate representation of the Port of

Guam and the location of the fuel facilities.

23.    The attached photograph is a true and accurate representation of the

vessel.

24.    The attached pages are true and accurate copies of the Port of Guam's

Harbor Rules and regulations pages 1, 5, 6, 7,  20, and 21.

**SO STIPULATED.**

LAW OFFICES OF GORMAN & GAVRAS


Date:  August __, 2004.          By:  _____
                                      TIMOTHY MB FARRELL, ESQ.
                                      Attorneys for Plaintiff
                                      JUAN Q. PEREZ


                                 KLEMM, BLAIR, STERLING & JOHNSON


Date:  August __, 2004.          By:  _____
                                      VINCENT LEON GUERRERO, ESQ.
                                      Attorneys for Defendants

4



http://www.dw.co.kr/fishery/ship_img/p_8906.jpg

1/7/2004



PHILIPPINE SEA

LEGEND

- Small Craft Refuge
- Open space
- Natural Preserve
- Commercial Port
- Fuel Facilities Cement Import
- Dinner Cruise
- Water Recreation
- Fishing Facilities
- Industrial

APRA HARBOR

# ⊕ DONGWON INDUSTRIES CO., LTD.

| Home | About us | Business Area | Products&Services | Investor Info | Fleet Intro | Contact Us |



## Purse Seiner

Dongwon owns 13 out of 27 round haul netters in Korea; sin its introduction of the first round haul netter, "the COSTA DE MARFIL," in 1979. The Dongwon fleet has expanded continuously and advanced to become a gigantic fleet that occupies approximately 50 % of the total number of Korean round haul netters. Proud of having the largest fleet of round haul netters and catch in Korea, Dongwon exerts all possible efforts to produce high-quality products and maintain freshne of the catch in keeping with its history and tradition. In this capacity, the company has introduced and observed HACCF (Hazard Analysis and Critical Control Points) system for stric quality control, whereby it passed the sanitary test required t EU and obtained qualification to export raw material to European countries.

≻ E-mail : tunabest@dw.co.kr

## Fishing Ground

The tuna caught in the West Pacific is mainly skip jack and yellowfin, and Dongwon's annua catch amounts to approximately 100,000 tons, one half of which is exported to Thailand, Japan, Europe, South America, and the like as raw materials while the other half is sold to Dongwon F&B for canning.

The purpose of navigation: All the crew from the captain to the seamen of the Dongwon's fle of 13 round haul netters are exerting all possible efforts night and day in order to increase th catches of tuna used as raw materials for canned products for domestic as well as foreign sales and markets.

## Methods of Harvesting Tuna

Circling around the 30-mile distant fishing ground from a main ship, helicopters as well as various electronic devices detect a school of fish and by radio inform the main ship which weighs approximately 800-1000 tons. Then, the ship approaches the spot, unloads a skiff, a encloses the school of tuna with a 2.5-km-long net. The caught fish are carried to a store by conveyor system to be quick frozen and transported to domestic and foreign buyers by a reefer.

## The Distribution Procedure from Catch to Consumers

Catch by round haul netters ¡æ the catch stored in the cold storage facilities on the seiner ¡a transferred to a carrier reefer ¡æ entry into a domestic/foreign port ¡æ delivered to the co facilities at the cannery ¡æ processing at the cannery.

## Present State of Tuna Purse Seiners (All of 13 Ships)

| NO | Ship¡¯s Name | Gross Ton (t) | LBD(m) | Maximum Speed (knot/mile) | Crew Capacity | Fishing Ground |
|----|------------|---------------|--------|---------------------------|---------------|----------------|
| 1 | GRANADA | 996.20 | 60.36*12.26*5.82 | 16 | 24 | The Sou Pacific |
| 2 | DEOLINDA | 1139.01 | 60.86*12.8*5.64 | 17 | 24 | The Sou Pacific |
| 3 | LADY MARION | 1139.01 | 60.44*12.80*5.64 | 17 | 24 | The Sou Pacific |
| 4 | SOUTH SEA | 897.26 | 55.5*12.19*5.85 | 14 | 24 | The Sou Pacific |
| 5 | ELSPETH | 1139.01 | 60.86*12.8*5.64 | 17 | 24 | The Sou Pacific |
| 6 | ORIENTAL KIM | 1139.01 | 60.86*12.8*5.64 | 17 | 23 | The Sou Pacific |
| 7 | OCEAN MASTER | 1349.20 | 68.29*13.64*5.63 | 17.45 | 25 | The Sou Pacific |
| 8 | WESTERN KIM | 1201.65 | 61.15*12.8*5.58 | 16.67 | 24 | The Sou Pacific |
| 9 | UNIVERSE KIM | 981.67 | 60.48*12.26*5.82 | 15 | 24 | The Sou Pacific |
| 10 | EASTERN KIM | 411.00 | 58.03*10.87*7.52 | 13 | 23 | The Sou Pacific |
| 11 | JUVENTUS | 978.61 | 61.34*12.95*5.8 | 15 | 24 | The Sou Pacific |
| 12 | COSMOS KIM | 995.63 | 61.67*12.5*5.79 | 16 | 24 | The Sou Pacific |
|  |  |  |  |  |  | The Sou |

| 13 | COSTADEMARFIL | 807.12 | 57.05*11.6*5.5 | 15.5 | 24 | Pacific |

Copyright(c) Dongwon Industries Co., Ltd. All Rights Reserved.   E-mail : Webr



# HARBOR RULES AND REGULATIONS

## OF THE

## PORT AUTHORITY OF GUAM



**Adopted by the Board of Directors of the
Port Authority of Guam on
June 9, 2000**

**Signed into Public Law 26-172 on
December 27, 2001**

1

**2.31** **Typhoon Condition 1:** Typhoon winds of 64 knots (77 miles per hour) or more are anticipated within 12 hours.

**2.32** **Vessel:** Power boats, ships, tugs, sailing vessels, barges, scows, lighters, ferry boats, and all other watercraft, except public vessels of the United States.

**2.33** **Vessel Master:** The designated person responsible for the safe navigation and operation of a vessel.

**2.34** **Wharfage:** The charge assessed against all cargo:

    a.    Passing or conveyed over, onto or under any quay or wharf; or
    b.    Passing or conveyed to or from a vessel when such vessel is:

        i.     made fast to a quay or wharf, or
        ii.    moored in any slip, channel, basin or canal; or
        iii.   made fast to another vessel which is made fast to a quay, wharf, or moored in any slip, channel, basin or canal (wharfage is solely the charge on cargo for the use of the quay, wharf, slip, channel, basin or canal and does not include charges for any other activity or service).

### 3.0 RESPONSIBLE OFFICIALS

**3.1** **Harbor Master:** The Harbor Master is the designated representative of the Port Authority of Guam, and its General Manager, and as such is delegated full authority to administer these Rules and Regulations. In addition, the Harbor Master may issue orders and establish procedures necessary for the safe and efficient use and operation of all ports, harbors and marinas within the Port Authority's jurisdiction. Any authority herein given to the Harbor Master may be delegated by the Harbor Master to the Assistant Harbor Master.

**3.2** **Port Manager:** The Port Manager is the General Manager of the Port Authority of Guam, and is responsible for the overall administration of the Port Authority, from cargo handling and equipment maintenance to personnel management.

**3.3** **Captain of the Port:** As stated in 33 C.F.R. 1.01-30, the Captain of the Port, or delegated representatives, enforce within a particular area, port safety and security and marine environmental protection regulations, including, without limitation, regulations for the protection and security of vessels, harbors, and waterfront facilities; anchorages; security zones; safety zones; regulated navigation areas; deepwater ports; water pollution; and ports and waterways safety.

**3.4** **Dock Master:** The Dock Master is the duly authorized representative of the Harbor Master whose duties are to berth vessels at berths so designated by the Harbor Master or other authorities and to advise vessel masters and crews of these Rules and Regulations.

**3.5** **Vessel Master:** The Vessel Master is the designated person in charge of a vessel. The Vessel Master shall obey and carry into effect any orders given by the Harbor Master or Dock Master in relation to the plans and manner of bringing vessels to anchorage, entering or leaving a harbor, or coming alongside of, or leaving any quay or wharf, and shall not move or allow his vessel to be moved in, out, or within a harbor, or anchorage without the permission of the Harbor Master or Dock Master.

5

3.6 **The Vessel Master's Duties:** The safe navigation of a vessel, including piloting, is the paramount duty of the Vessel Master, and the presence of a Harbor Pilot on the bridge shall in no way relieve the Vessel Master of his duties. The Vessel Master remains at all times in full command of the vessel. He shall continue to navigate and shall take bearings and soundings and check compass courses, check radar, and take all actions necessary to safeguard the vessel under his command. In that regard, it shall be the duty of the vessel and her Vessel Master:

a. To immediately inform the Pilot of all reports by lookouts;
b. On radar equipped vessels, to have the radar functioning and monitored as needed so that the Vessel Master and Harbor Pilot can be informed of observed targets;
c. To arrange for and provide adequate tug assistance, if required by these Rules and Regulations and to arrange for and have available adequate vessels lines to assist in tying up the tug or tugs;
d. To remain on the bridge at all times and to accompany the Harbor Pilot in respective duties on and about the bridge;
e. To provide and supervise competent vessel personnel;
f. To understand and acknowledge that the Harbor Pilot is employed primarily to provide knowledge of the Harbor, and that the Harbor Pilot is acting solely in an advisory capacity, and not in a command capacity, and that the Harbor Pilot has no authority independent of the Vessel Master;
g. To have at all times an adequate ship's anchor properly prepared and ready to drop;
h. To provide officers conversant with the English language; and if they do not understand English, then request that the Harbor Pilot give orders by hand signals;
i. It is the duty of the vessel owners, masters, operators, charterers, or agents to inform the Harbor Pilot, either before or immediately after the Harbor Pilot boards the vessel, of any vessel peculiarities, including but not limited to, the following:

  i. Any defects or deficiencies in the vessel, her personnel, engines or tackle;
  ii. Any vessel peculiarities concerning steering, stopping, handling, speed and maneuvering and the propensity-of the vessel to steer; and
  iii. Any other information, whether or not herein enumerated, that might assist the Harbor Pilot in the pilotage of the vessel.

3.7 **Agents:** The Agents, and their designated representatives, when requested by the Harbor Master, shall give and afford the Harbor Master all possible aid in the performance of any of his duties in relation to the vessels they represent.

3.7 **Pilotage Services:** All pilotage services shall be offered and rendered, and shall be requested and accepted by the vessel, on the express understanding that such pilotage services are provided or performed solely in the Harbor Pilot's capacity as a servant of the vessel and of her owners, masters, operators, charterers or agents, and not otherwise.

3.8 **Berthing of Vessels:** The berthing of vessels at Port Authority quays or wharves shall be at the direction of the Harbor Master.

3.9 **Vessel Master Shall Assist the Harbor Master:** The Vessel Master, and the crew thereof, when requested by the Harbor Master, shall give and afford the Harbor Master all possible aid in the performance of any of his duties in relation to such vessel.

3.10 **If No Person Aboard a Vessel:** If by reason of there being no person aboard a vessel with proper authority, or if by reason of an insufficient number of persons aboard such vessel, or if the Vessel Master and/or crew of a vessel refuses to aid the Harbor Master in moving, pumping, mooring or un-mooring such vessel when so directed by the Harbor Master, the Harbor Master is empowered to move, pump, moor or un-moor, place or remove such vessel. To this end, the Harbor Master may, if necessary, hire such assistance, equipment and tackle and/or purchase and put aboard such quantity of ballast as to him seems requisite all at the expense of the,

6

owners, charterers or agents of such vessel. All costs shall be paid to the Port Authority before permission for departure is given. The Port Authority shall in no way be liable for any damage or loss occurring to any vessel in consequence of such proceedings.

**3.11** **No Person to Cut or Cast Off Lines:** No person without the consent of the Harbor Master shall cut or cast off any mooring lines, rope or tackle made fast or attached to any vessel, quay, wharf, mooring, buoy or other place when the same has been fastened or attached by the Harbor Master or by order of the Harbor Master.

**3.12** **Typhoon Evasion Plan:**

    **a.** **Typhoon Condition 3**: Vessels under 200 feet in length, and not normally home-ported in Guam, will depart from the Harbor if directed by the Harbor Master or designated representative. All disabled vessels must obtain permission from the Captain of the Port and the Harbor Master to remain in Port at a designated mooring. The intent of this provision is to require such vessels to depart from the Harbor while able to do so before conditions worsen, unless such vessels can be adequately secured during the typhoon. The Harbor Master's order to depart for sea shall be final and not subject to appeal.

    **b.** **Typhoon Condition 2**: All vessels will depart for sea when directed by the Harbor Master or a designated representative except those disabled vessels authorized by the Captain of the Port or the Harbor Master. The Port shall be closed when so ordered by the Captain of the Port.

## 4.0 USE OF WATERWAYS AND HARBOR FACILITIES

**4.1** **Port Authority Rules and Regulations Shall Govern:** The use of any waterway or facility under the jurisdiction of Port Authority by any vessel shall constitute the consent and evidences the agreement on the part of the vessel's owners, charterers and lessees to comply with, and be governed by, all terms and conditions of these Harbor Rules and Regulations, to pay all charges specified in the Port Authority Tariff Schedule, and to discharge all fines assessed against the vessel.

**4.2** **Preference for Use of Wharves F-5 and F-6:** Preference in the use of wharfs F-5 and F-6 shall be given to vessels loading or unloading shipping containers.

**4.3** **Testing of Engines at the Dock:** The engines of any vessel moored at any quay, wharf, dolphins, or other structure shall not be tested except by permission of the Harbor Master. This shall not apply to routine pre-departure warming up of engines.

**4.4** **Speed of Engines During Dock Trials:** The speed of engines being tested as referred to in the preceding paragraph shall not exceed the speed of such engines when operated under a dead slow bell.

**4.5** **Responsibility for Any Damage Done During Dock Trials:** Any vessel testing her engines as previously referred to will be held responsible for any damage to quays, wharves or other vessels or property as a result of such testing of her engines.

**4.6** **No Vessel to Blow Tubes in Port:** No vessel shall blow tubes or emit unnecessary smoke or polluting vapors of any kind at any time while in port.

**4.7** **No Garbage to Be Dumped:**

7

produce sparks located closer than fifty (50) feet shall cease operation. On small craft, such as fishing boats and pleasure boats, all ports, windows, doors and hatches shall be closed.

h.  Only intrinsically safe flash lights may be used during bunkering operations.

i.  Drip pans will be placed under all points where fuel could leak onto either the wharf, decks, or into the harbor, and scuppers shall be blocked to prevent fuel from escaping into the Harbor.

j.  There shall be no smoking, lighting of matches, lighters or use of other devices producing sparks or flame or the throwing of switches (other than certified non-sparking types) on all vessels bunkered at berths.

k.  No unauthorized persons shall be allowed either on board the vessel, or in the immediate vicinity of the bunkering point.

l.  When a hose and nozzle are used during bunkering operations, the nozzle must be kept in continuous contact with the vessel's fuel intake opening to eliminate the possibility of static sparks.

m.  For all vessels with a capacity greater than 250 barrels of oil, a person in charge with the proper endorsement required by 33 C.F.R. 155.700 shall be stationed in the vessel by the fuel intake at all times while the discharge operation is in progress. For all transfers to U.S. or foreign vessels, in accordance with 33 C.F.R. Part 156.120, the vessel and facility person in charge shall both be stationed at the site of the transfer operation while the operation is in progress. Such person should have a good command of the English language in order to communicate with shore personnel. Should there be no one in the crew capable of this, an interpreter must be present during the entire fueling operation.

n.  Upon completion of the taking of bunkers, all shore connections must be closed and the vessel's filling lines closed prior to disconnection of the grounding lines. The grounding lines shall be disconnected from the shore first, then from the vessel.

o.  Any spilled oil or fuel shall be cleaned up immediately. The vessel should be ventilated thoroughly before the opening of doors, hatches, portholes, etc., or the operating of any spark producing mechanism, to dispel any fumes for at least five minutes before resuming normal operations. On small craft such as fishing boats and pleasure craft, particular attention should be paid to ensuring that fumes have not accumulated in the bilges, hatches, or other below deck spaces.

p.  The Harbor Master shall be notified upon completion of all bunkering operations.

q.  Compliance is also required with all other federal and territorial laws and regulations pertaining to bunkering, not specifically mentioned above, such as the flying of a red ("Baker") flag.


## 9.0 USE OF WHARVES

9.1  **Cleanliness of Wharves:** All wharves, sheds and open areas which may be used for the handling of cargo shall be kept in a clean and sanitary condition and free from all obstructions.

9.2  **Charges for Cleaning Wharves Assessed Against Vessel:** In cases where the Port Authority takes over the cleaning of wharves, sheds or open areas, a charge shall be computed as the total

21

(10) Acetylene hoses shall be tested frequently for leaks. If acetylene has been escaping in confined areas, the areas shall be properly ventilated and cleared of all gas, and the area tested and inspected by a competent person, before welding or burning operations are resumed.

(11) No acetylene torch shall be left unattended while burning. When not being used the hose shall be coiled or looped in a workman-like manner and placed on a bracket at the cylinders, and the pressure in the hose relieved by closing off the valves on the cylinders and opening the valves on the torch. Lines left unattended during meal times or other extended periods shall be either removed from compartments or disconnected at the cylinders.

(12) Oxygen cylinders shall be kept free from oil and grease at all times, because oxygen under pressure brought into contact with oil or oily substances oxidizes so rapidly that an explosion may occur.

(13) Oxygen shall not be used to blow out oil pipes, for paint spraying, or for pneumatic tools, as an explosion might occur.

(14) Compressed gas cylinders shall not be refilled on any wharf.

d. **Notification of Other Agencies:** When the Harbor Master or the Port Authority Safety Officer issues a permit to do hot work, the appropriate federal and local agencies shall be notified of such action. When hot work is being done in the Harbor, the United States Coast Guard Marine Safety Officer on duty at the time and the Harbor Master shall be immediately notified.

## 8.18 Bunkering:

a. At least four hours prior to bunkering vessels at any wharf or berth, the supplier shall first obtain permission from the Harbor Master.

b. The United States Coast Guard Marine Safety Office must be notified at least four hours in advance for bunkering operations at anchorage for all vessels with a capacity greater than 250 barrels of oil (refer 33 C.F.R. 156).

c. During bunkering operations in which bunkers are being taken through an open fuel intake or from a fuel tank truck, where a fire hazard may exist, cargo operations shall cease. This shall not apply when bunkers are taken from a pipeline connected by gasketed joints directly to the vessel piping system. However, the Harbor Master or Safety Officer may direct that operations be discontinued when an oil spill occurs (as from a broken hose or ruptured gasket) or if a potentially hazardous situation exists.

d. No welding, burning, or other types of work that may create hazardous conditions shall be permitted while bunkering operations are in progress. This time period shall commence from either (a) the tank truck arrives onto the wharf, or (b) when a hose is hooked up to the wharf's fuel line, or (c) the vessel's bunkering connection is opened. The time period shall cease when either (a) the tank truck is off the wharf, or (b) the wharf and vessel fuel connections have been secured.

e. The mooring lines of the vessel shall be checked prior to the bunkering operation to ensure they are secure and to prevent any surging.

f. Prior to any fuel line hook-up being made or a fuel hose stretched to a vessel, a grounding line shall be connected from the vessel to the wharf. This grounding line should be connected first to the vessel and then connected to the shore ground.

g. Except when bunkers are taken from a pipeline connecting through the gasketed joints directly to the vessels piping system, all engines, motors, fans and other devices liable to

20